UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ORIGINAL FILED
03 MAR 31 PM 3: 16
U.S. DISTRICT COURT
N.D. OF ALABAMA

SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
) Civil Action No.
vs. )
)                                                    CV-03-C-0720-S
WILLIAM T. OWENS and )
WESTON L. SMITH, )
)
Defendants. )
_____)

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The Securities and Exchange Commission ("Commission") files this Complaint for Injunctive and Other Relief and alleges as follows:

### INTRODUCTION

1.     Since at least 1999, HealthSouth Corporation ("HRC"), one of the nation's largest healthcare providers, has overstated its earnings by at least $1.4 billion. This massive overstatement occurred because HRC's founder, chief executive officer ("CEO") and chairman of the board, Richard M. Scrushy ("Scrushy"), insisted that HRC meet or exceed earnings expectations established by Wall Street analysts.

2.     William T. Owens ("Owens"), HRC's president and chief operating officer, and Weston L. Smith ("Smith"), HRC's former chief financial officer, were intimately involved in the scheme to inflate artificially HRC's earnings.

3.     When HRC's earnings fell short of such estimates, Scrushy directed HRC's accounting personnel, including Owens and Smith, to "fix it" by artificially inflating the company's earnings to match Wall Street expectations. To balance HRC's books, the

false increases in earnings were matched by false increases in HRC's assets. By the third quarter of 2002, HRC's assets were overstated by at least $800 million, or approximately 10 percent of total assets. HRC's most recent reports filed with the Commission continue to reflect the fraudulent numbers.

4.      Although Smith knew that HRC's financial statements were materially misstated, on August 14, 2002, he signed HRC's Form 10-Q for the period ended June 30, 2002. At the same time, Smith falsely certified under oath that (a) HRC's most recent annual report, the company's Form 10-K for the period ended December 31, 2002 ("2001 Form 10-K"); and (b) HRC's Form 10-Q for the period ended June 30, 2002 ("Form 10-Q for the second quarter of 2002"), contained "no untrue statement of a material fact." In fact, the financial statements filed with the Form 10-Q for the second quarter of 2002 overstated HRC's earnings, identified on HRC's income statement as "Income Before Income Taxes And Minority Interests," by at least 4,700 %.

5.      Although Owens knew that HRC's financial statements were materially misstated, he signed HRC's form 10-Q for the period ended September 30, 2002. By his signature, Owens represented that the form 10-Q fairly presented, in all material respects, the financial condition of HRC. Owens knew that, in thruth, the report materially overstated HRC's assets.

6.      Defendants Owens and Smith have engaged in, and unless restrained and enjoined by this Court, will continue to engage in, acts and practices which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1

thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and acts and practices that aid and abet HRC's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-13 and 13a-14 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13 and 240.13a-14].

## JURISDICTION AND VENUE

7.   The Commission brings this action pursuant to Sections 20(b), 20(d) and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77t(e)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin the defendants from engaging in transactions, acts, practices and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for an officer and director bar, disgorgement of ill-gotten gains and prejudgment interest, other equitable relief, and for civil money penalties.

8.   This Court has jurisdiction of this action pursuant to Sections 20(b), 20(d), 20(e) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9.   The defendants, directly and indirectly, have made use of the mails, the means and instruments of transportation and communication in interstate commerce, and the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

10.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because defendants Owens and Smith reside within this district.

## THE DEFENDANTS

11.     William T. Owens, a resident of Birmingham, Alabama, has been employed by HRC since 1986. He served in various capacities including chief financial officer ("CFO") from February 2000 to August 2001, president and chief operating officer ("COO") from August 2001 to August 2002, president and CEO from August 2002 to January 2003 and executive vice president and CFO from January 2003 to March 2003. Owens is a certified public accountant.

12.     Weston L. Smith, a resident of Birmingham, Alabama, began his employment with HRC in 1987. From 1987 through March 2000, Smith was employed in the Reimbursement Department of HRC. In this department, Smith worked as an assistant vice president, vice president, senior vice president and director. Smith became the controller of HRC in March 2000 and functioned in that capacity until August 2001 when he became HRC's chief financial officer. Smith is a certified public accountant.

## OTHERS INVOLVED

13.     HealthSouth Corporation was incorporated in Delaware in 1984 and is headquartered in Birmingham, Alabama. HRC is the nation's largest provider of outpatient surgery, diagnostic and rehabilitative healthcare services. It owns or operates over 1,800 different facilities throughout the United States and abroad, including inpatient and outpatient rehabilitation facilities, outpatient surgery centers, diagnostic centers, medical centers and other healthcare facilities.

14.     HRC's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act. For the year ended December 31, 2001, HRC reported total revenues of $4 billion and net income of $76 million. HRC's stock was listed on the New York Stock Exchange ("NYSE") and was actively traded under the symbol of "HRC."

15.     Richard M. Scrushy, age 49, founded HRC and served as its Chairman since 1994. He served as HRC's Chief Executive Officer ("CEO") from 1994 until August 27, 2002. On January 6, 2003, he reassumed the position of HRC's CEO. Shortly after HRC went public in 1986, Scrushy instructed HRC's senior officers and accounting personnel, including Owens, to materially inflate HRC's earnings to match Wall Street analysts' expectations.

16.     HRC and Scrushy are defendants in a related matter, SEC v. HealthSouth Corp. and Richard M. Scrushy, Case No. CV-03-J-0615-S, which was filed in this Court on March 19, 2003.

17.     Before the stock markets opened on March 19, 2003, the Commission ordered a two-day trading suspension in HRC's securities, which expired on March 20, 2003. In the Matter of HealthSouth Corporation, File No. 500-1 (March 19, 2003); *See also* Securities Exchange Act Release No. 47529 (March 19, 2003).

18.     The closing price of HRC on March 18, 2003 was $3.91. The NYSE halted trading in HRC before trading could resume and announced its intention to begin a de-listing proceeding against the company. Subsequently, on March 24th, HRCs common stock resumed trading in the Over-the-Counter market under the symbol "HLHS", and closed at eleven cents at the end of the day. HRC had more than 390 million common

shares outstanding according to its Form 10-Q for the period ended September 30, 2002. The resulting loss in market capitalization of HRC's common stock exceeds $1.5 billion.

19. HRC also has large amounts of debt securities outstanding. The losses to the people who own those securities, to the honest HRC employees who knew nothing about this wholesale fraud and to the economic well-being of Birmingham and the surrounding communities are incalculable.

## THE SCHEME TO OVERSTATE EARNINGS

20. Shortly after HRC became publicly traded in 1986, and at Scrushy's instruction, the company began to artificially inflate its earnings to match Wall Street analysts' expectations. Between 1999 and the second quarter of 2002, HRC intentionally overstated its earnings, identified as "Income Before Income Taxes And Minority Interests," by at least $1.4 billion in reports filed with the Commission.

21. HRC's senior officers, including Owens (from at least 1996), Smith (from at least 1997), and others recognized that the earnings shortfall created a substantial risk that, unless HRC's earnings per share met analysts' expectations, the market price of HRC's securities would decline. The value of stock options owned by, and bonuses paid to, certain HRC senior officials depended in part on HRC meeting earnings expectations.

22. Pursuant to Scrushy's directions to inflate earnings, on a quarterly basis, Owens presented Scrushy with an analysis of HRC's actual, but as yet unreported, earnings for the quarter as compared to Wall Street's expected earnings for the company.

23. If HRC's actual results fell short of expectations, Scrushy and Owens provided HRC's accounting staff with the desired earnings per share number and instructed them

6

to "fix it" by recording false earnings in HRC's accounting records to make up the shortfall.

24. HRC's senior accounting staff, including, by at least 1997, Smith, would then convene a meeting to "fix" the earnings shortfall. By 1997, the attendees referred to these meetings as "family meetings" and referred to themselves as "family members."

25. At the meetings, the "family members," including Owens, Smith and others determined what false accounting entries would be made and recorded to HRC's income statement to inflate reported earnings to match Wall Street analysts' expectations.

26. Most of the fraudulent entries to the income statement consisted of reducing a contra revenue account, called "contractual adjustment," and/or decreasing expenses, (either of which increased earnings).

27. The contractual adjustment account is a revenue allowance account that estimates the difference between the gross amount billed to the patient and the amount that various healthcare insurers will pay for a specific treatment. HRC deducted this account from gross revenues to derive net revenues, which were disclosed on HRC's periodic reports filed with the Commission.

28. The scheme to manipulate earnings allowed Scrushy to boast in HRC's 2001 annual report that:

> In 2001 we set new records as we pushed our revenues well over $4.3 billion and celebrated another year of fulfilling Wall Street expectations, <u>maintaining our record as the Fortune 500 company with the second longest streak for meeting or exceeding analysts' expectations</u>.

29. The "family members" also identified false balance sheet entries to match the false entries to HRC's income statement. The balance sheet entries were necessary

7

because generally accepted accounting principles ("GAAP") require any increase in revenue or decrease in expenses to be matched with either an increase in assets or decrease in liabilities. The false balance sheet entries were made to the Property Plant and Equipment ("PP&E") Account; cash account; inventory account; and intangible asset (goodwill) account.

30. The "family members" referred to the difference between actual earnings and Wall Street expectations as "the hole" and the false balance sheet entries that matched false income statement entries as "dirt."

31. The "family members," including Owens, Smith and others, designed the fictitious accounting entries to avoid detection. For example, if the family members decided to increase inventory artificially, they increased inventory accounts at various HRC facilities by different amounts because they knew that if amounts were increased uniformly, the outside auditors might become suspicious.

32. In addition, when falsely increasing the PP&E account, the family members used a line item at each facility listed as "AP Summary." When the auditors asked HRC for a fixed assets ledger for various facilities, HRC accounting personnel would re-generate the fixed asset ledger, replacing the "AP Summary" line item with the name of a specific fixed asset that did not exist at the facility, while leaving the dollar amount of the line item unchanged.

33. Additionally, each inflation of earnings and corresponding increase in fixed assets were recorded through several intermediary journal entries in order to make the false inflation more difficult to trace.

34. HRC, with the knowledge and consent of Owens and Smith, also created false documents to support its fictitious accounting entries. For example, during the audit of HRC's 2000 financial statements, the auditors questioned an addition to fixed assets at one particular HRC facility. HRC accounting personnel, knowing that this addition was fictitious, altered an existing invoice (that reflected an actual purchase of an asset at another facility that approximated the dollar amount of the fictitious addition) to fraudulently indicate that the facility in question had actually purchased that asset. This altered invoice was then given to the auditors to support the recording of the fictitious asset in question.

35. Owens, Smith and other members of the scheme knew that there was no factual basis for these false income statement and balance sheet entries. They also knew that the false entries were prohibited under GAAP.

36. Owens and Smith each knew when the entries were made that the false and fraudulent journal entries that were made to HRC's books and records in order to artificially inflate earnings would be reflected in HRC's financial statements and in its public filings with the SEC. They also knew that the false journal entries would falsely overstate HRC's revenue, earnings and earnings per share.

37. Owens, Smith and others caused HRC to file quarterly and annual reports with the Commission that materially misstated, among other things, HRC's net income, revenue, earnings, EPS, assets and liabilities from at least 1999 through the present. As a result of their scheme, HRC's revenue and earnings were inflated by hundreds of millions of dollars in its public filings.

38. In order to cover up their scheme, in August 2002, Scrushy, Owens and Smith met and discussed the need for Smith, who was then HRC's CFO, to sign and file the

certification required under Commission Order No. 4-460, <u>Order Requiring the Filing of Sworn Statements Pursuant to Section 21(a)(1) of the Securities Exchange Act of 1934</u> (June 27, 2002). ("Order 4-460"). This certification required Smith to falsely certify that HRC's Form 10-Qs for the first and second quarter of 2002, and HRC's 2001 Form 10-K fairly presented, in all material respects, the financial condition and results of HRC.

39. Scrushy, Owens and Smith also agreed that Smith would sign and cause to be filed with the SEC a statement required under the Sarbanes-Oxley Act of 2002, certifying that HRC's Form 10-Q for the second quarter of 2002 fairly presented, in all material respects, the financial condition and results of HRC.

40. When Scrushy and Smith signed these documents, Scrushy, Owens and Smith and others knew that the financial statements in HRC's 2001 Form 10-K and first and second quarter 2002 Form 10-Qs contained materially false and misleading information.

41. In fact, the financial statements filed with this report overstated HRC's earnings, identified as "Income Before Income Taxes And Minority Interests" on HRC's income statement, by at least 4,700 %. The balance sheet included in these financial statements overstated gross PP&E by approximately $1 billion, or approximately 33% of the total PP&E reported. The amount of cash reported was falsely overstated by more than $300 million. HRC's total assets were overstated by more than $1.5 million.

42. Owens signed HRC's Form 10-Q for the period ended September 30, 2002. By his signature, Owens represented that the Form 10-Q fairly represented, in all material respects, the financial condition of HRC. In truth, that report materially overstated HRC's assets.

43.  While in possession of material non-public information, specifically that HRC's public filings included materially false and misleading statements, Owens and Smith exercised HRC options and sold securities of HRC into the public market.

## CLAIMS FOR RELIEF

### COUNT I—FRAUD

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

44.  Paragraphs 1 to 43 are hereby realleged and are incorporated herein by reference.

45.  Defendants Owens and Smith, from at least 1999 through the second quarter of 2002, in connection with the offer or sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

   (a) directly and indirectly employed devices, schemes and artifices to defraud purchasers of such securities;

   (b) directly and indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading; and

   (c) engaged in transactions, practices and a course of business which would have operated as a fraud or deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

46.  Defendants Owens and Smith knowingly, intentionally and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud. In engaging in such devices, schemes and artifices to defraud, Owens and Smith acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

11

47. By reason of the foregoing, defendants Owens and Smith, directly and indirectly, have violated, are violating and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT II–FRAUD

### Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

48. Paragraphs 1 through 43 are hereby realleged and are incorporated herein by reference.

49. Defendants Owens and Smith, from at least 1999 through the second quarter 2002, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c) engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described in the paragraphs above.

50. Owens and Smith knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Smith and Owens acted with

scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

51.   By reason of the foregoing, Owens and Smith, directly and indirectly, have violated, are violating and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT III-AIDING AND ABETTING REPORTING PROVISIONS

**Aiding and Abetting HRC's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12-20, 240.13a-1, 13a-13 and 13a-14]**

52.   Paragraphs 1 through 43 are hereby realleged and are incorporated herein by reference.

53.   Owens and Smith, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, which occurred when HRC filed annual and periodic reports that contained financial statements that were not prepared in conformity with GAAP and contained material misstatements. Through the conduct described in the above paragraphs, Owens and Smith knowingly or recklessly substantially assisted HRC's violations of this section and rules.

54.   Owens violated Exchange Act Rule 13a-14 when, on November 11, 2002, he certified pursuant to the Sarbanes-Oxley Act of 2002 that HRC's third quarter Form 10-Q was materially accurate.

13

### COUNT IV- AIDING AND BETTING BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

#### Aiding and Abetting HRC's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
#### [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]

55. Paragraphs 1 through 43 are hereby realleged and are incorporated herein by reference.

56. Owens and Smith, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(A) of the Exchange Act, which occurred when HRC failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of HRC's assets. Through the conduct described in the above paragraphs, Owens and Smith knowingly or recklessly substantially assisted HRC's violations of these sections.

57. Owens and Smith, from at least 1999 through the second quarter of 2002, aided and abetted HRC's violations of Section 13(b)(2)(B) of the Exchange Act, which occurred when HRC failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (a) transactions were executed in accordance with management's general or specific authorization; (b) transactions were recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability of assets; (c) access to assets was permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Through the

conduct described in the above paragraphs, Owens and Smith knowingly or recklessly substantially assisted HRC's violations of this section.

## COUNT V - BOOKS AND RECORDS AND INTERNAL CONTROLS VIOLATIONS

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder

58.  Paragraphs 1 through 43 are hereby realleged and are incorporated herein by reference.

59.  Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account required by Section 13(b)(2)(A) of the Exchange Act. Rule 13b2-1 prohibits any person from directly or indirectly falsifying or causing the falsification of any such books, records or accounts. Through the conduct described above, Owens and Smith violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue a permanent injunction enjoining defendants Owens and Smith and their agents, servants, employees, attorneys, and all persons in active concert or participation with

them who receive actual notice of the order by personal service or otherwise, and each of them:

    a.    from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    b.    from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

    c.    from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1];

    d.    from aiding and abetting violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-13 and 13a-14 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13 and 240.13a-14]; and

    e.    from aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### III.

Issue an Order requiring defendants Owens and Smith to disgorge any ill-gotten gains and losses avoided as a result of the conduct alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

### IV.

Issue an Order requiring defendants Owens and Smith, pursuant to Section 20(d) of the Securities Act [15 U.S.C. 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. 78u(d)(3) and 78u-1], to pay civil monetary penalties.

### V.

Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] permanently prohibiting

defendants Owens and Smith from acting as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C.§ 78o(d)].

VI.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as may be necessary and appropriate.

RESPECTFULLY SUBMITTED,

William P. Hicks by M.G.L.
William P. Hicks
DISTRICT TRIAL COUNSEL
Ga. Bar No. 351649

M. Graham Loomis
SENIOR TRIAL COUNSEL
Ga. Bar No. 457868

Alex Rue
SENIOR TRIAL COUNSEL
Ga. Bar No. 618950

COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
3475 Lenox Road, N.E., Suite 1000
Atlanta, Georgia 30326-1234
(404) 842-7600
(404) 842-7679 fax